## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

M.S.P.C., G.L.V.A., P.J.C.V. (a minor), B.C.M.,
J.R.C.C. (a minor), E.O.Z., P.O. (a minor), M.R.R.,
C.M.R., and R.E.C.G.,

Address for E.O.Z. and P.O.:
[Address redacted ]

Address for All Other Plaintiffs:
Artesia Family Residential Center
1300 W. Richey Ave.
Artesia, NM 88210

Civil Case No. _____

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

*Plaintiffs*,

v.

JEH JOHNSON, Secretary of the Department of
Homeland Security, in his official capacity,
Washington, DC 20528; ERIC H. HOLDER, Jr.,
Attorney General of the United States, in his official
capacity, 950 Pennsylvania Avenue, NW, Washington,
DC 20530; THOMAS S. WINKOWSKI, Principal
Deputy Assistant Secretary for United States
Immigration and Customs Enforcement, in his official
capacity, 500 12th Street SW, Washington, DC 20536;
LEON RODRIGUEZ, Director of United States
Customs and Immigration Services, in his official
capacity, 111 Massachusetts Ave., NW, Washington,
DC 20001; R. GIL KERLIKOWSKE, Commissioner of
U.S. Customs and Border Protection, in his official
capacity, 1300 Pennsylvania Avenue, NW,
Washington, DC 20229; MARTIN E. ZELENKA,
Immigration and Customs Enforcement Acting Director
of Artesia Family Residential Center, in his official
capacity, Artesia Family Residential Center, 1300 W.
Richey Ave., Artesia, NM 88210,

*Defendants*.

Jennifer Chang Newell
Cecillia D. Wang
Kate Desormeau
Stephen B. Kang
American Civil Liberties Union
Foundation, Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0774

Melissa Crow, DC Bar #453487
Beth Werlin, DC Bar #1006954
Emily Creighton, DC Bar #1009922*
American Immigration Council
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7523

Zachary Nightingale
Lisa Knox
Van Der Hout, Brigagliano & Nightingale, LLP
180 Sutter Street, 5th Floor
San Francisco, CA 94104
(415) 981-3000

Alexandra Smith
American Civil Liberties Union
of New Mexico
1410 Coal Avenue, SW
Albuquerque, NM 87104
(505) 266-5915

Mitra Ebadolahi
Gabriela Rivera
American Civil Liberties Union of San Diego
& Imperial Counties
PO Box 92138-7131
San Diego, CA 92138-7131
(619) 232-2121

Lee Gelernt
Judy Rabinovitz
Andre Segura
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600

Trina Realmuto
National Immigration Project of the National
Lawyers Guild
14 Beacon Street, Suite 602
Boston, MA 02108
(617) 227-9727

Matthew E. Price, D.C. Bar. #996158
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6873

Gabriel A. Fuentes
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2808

Linton Joaquin
Karen C. Tumlin
Melissa Keaney
Alvaro Huerta
National Immigration Law Center
3435 Wilshire Boulevard, Suite 2850
Los Angeles, CA 90010
(213) 639-3900

Arthur B. Spitzer, D.C. Bar. #235960
American Civil Liberties Union
of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, D.C. 20008
(202) 457-0800

*Attorneys for Plaintiffs*
*Admission to U.S. District Court for the District of Columbia scheduled for September 8, 2014.

**INTRODUCTION**

1.   This is an immigration case involving life and death stakes.

2.   Plaintiffs are mothers and children from El Salvador and Honduras who, like many other Central Americans, have fled persecution in their countries of origin.

3.   The United States government arrested Plaintiff mothers and children shortly after they crossed into the United States near the Rio Grande Valley in Texas, and brought them to a makeshift detention facility in Artesia, New Mexico.  The detention facility is profoundly isolated, miles away from any major cities and lawyers.  The closest major metropolitan area is El Paso, Texas, which is close to 200 miles away.

4.   Under the Immigration and Nationality Act ("INA") and its implementing regulations— as well as under the Due Process Clause—Plaintiffs have an indisputable right to seek asylum and related relief, and to a fair hearing to present their claims.  But that process at Artesia has been anything but fair, and falls far short of the government's obligations under existing law. Instead, the government has created what can only be described as a "deportation mill" that is sending mothers and children back to their home countries to face serious harm without ever having given them a meaningful opportunity to present their claims.

5.    In its new policies reflecting this rush to judgment, the government has sacrificed the individualized consideration of asylum claims required by the statute, regulations, and Constitution, and imposed a more stringent—and unlawful—standard to deny meritorious claims presented by mothers and children detained at Artesia.

6.   Further, the government has instituted various procedural changes to the process, which are designed to limit the number of successful claims.  The government's new policies make it much more difficult for detained women and children to present and substantiate their claims to

asylum or other forms of immigration relief, and to seek the assistance of counsel in doing so. Under these new policies, families detained at Artesia are almost completely cut off from communications with the outside world, provided insufficient information and in some cases no information about their rights under the INA, affirmatively precluded from effectively contacting and receiving assistance from attorneys, and ultimately forced to navigate pro se a complex immigration process that is heavily weighted against them.  Detained mothers are subjected to a highly truncated process in which they are provided virtually no notice of when critical proceedings are scheduled to occur; asylum officers and immigration judges rush them to answer questions regarding the violence, death threats, and sexual abuse they fear—all while their children are listening; their children are ordered removed without being individually screened to determine whether they have a separate basis for fearing persecution; and their claims are denied for failing to properly respond to questions about their asylum claims phrased in complicated legal terminology.[1]

7.   The asylum process at Artesia and its consequence—a dramatic drop in the number of families who are found eligible to apply for asylum—is the direct result of policies announced at the highest levels of our government.  As Department of Homeland Security Secretary Jeh Johnson has stated: "[O]ur message to this group is simple: we will send you back."  That sentiment has been echoed publicly by others in the Administration, who have stated that the overwhelming majority of these Central American women and children do not have meritorious asylum claims—a political and policy-level judgment they reached *before* the detainees had an opportunity to present their individual cases.  Thus, rather than adjudicate these cases individually based on the actual facts presented at a fair asylum interview, the government has

---

[1] Attorney declarations detailing the effects of the policies identified in this complaint on women and children detained at Artesia are available online at https://www.aclu.org/ immigrants-rights/mspc-v-johnson.

categorically prejudged the claims of these Central American women and children, and decided—in advance—that these cases are not meritorious and that these women and children must be deported.  That message has been heard loud and clear in Artesia.  As a result, Plaintiffs and numerous other women and children with obviously credible claims have been ordered removed to countries where they face danger.  Indeed, the passage rate for the Artesia families is 37.8 percent, compared with the nationwide average grant rate of 77 percent under the preexisting procedures.

8.   The government's new asylum process at Artesia patently violates the INA and its implementing regulations, as well as the Due Process Clause of the Fifth Amendment.

9.   Providing vulnerable refugees with a fair process is not only central to our laws, but is a basic tenet of international law and the domestic laws of countless nations throughout the world. Whatever the political or policy considerations that may have led the Administration to create this new system at Artesia, those considerations cannot be permitted to override the government's obligation to provide these Central American women and children with a fair asylum process.

## JURISDICTION AND VENUE

10. This case arises under the United States Constitution; the INA, 8 U.S.C. § 1101 *et seq*.; the regulations implementing the INA's asylum process; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

11. This Court has jurisdiction pursuant to 8 U.S.C. § 1252(e)(3).  *See* § 1252(e)(3) (INA provision providing jurisdiction in the United States District Court for the District of Columbia over systemic challenges).  Pursuant to § 1252(e)(3)(D), "[i]t shall be the duty of the District

Court . . . to advance on the docket and to expedite to the greatest possible extent the disposition of any case considered under this paragraph."

12. The Court also can exercise federal question jurisdiction pursuant to 28 U.S.C. § 1331, and habeas jurisdiction pursuant to 28 U.S.C. § 2241.  For purposes of habeas jurisdiction, all individual Plaintiffs are in custody because they are either subject to orders of removal and/or presently detained at the Artesia Family Residential Center in Artesia, New Mexico.

13.  Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all § 1252(e)(3) actions be brought in the District Court for the District of Columbia.  In addition, venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

**PARTIES**

14. Plaintiff M.S.P.C. is a Salvadoran mother who fled her native country with her 10-month-old son after rival gangs threatened to kill her and her child.  They were apprehended after they crossed the border into the United States, and are presently detained at the Artesia detention facility.  Believing she was an informant for their rivals, gang members came to her house and threatened her life, running the barrels of their guns along her neck in a sexually threatening manner.  Members of the other gang then tried to force her to become an informant and made death threats against her and her son.  Finally, one gang member told her she had 48 hours to leave or they would kill her.  Ms. M.S.P.C. also fears that her son's father will kill her and take away her son if she returns to El Salvador.  Her son's father has physically abused her in the past; during one of those incidents of abuse, she was injured with a metal rod, which left a scar on her leg.  If she were to report any of this to the police, she believes her son's father would seek revenge against her.  Despite the substantial risk of persecution she and her 10-month-old

son face in El Salvador, and as a result of Defendants' unlawful policies and procedures, Plaintiff M.S.P.C. received a negative determination from an asylum officer, which has been affirmed by an immigration judge.

15. Plaintiff G.L.V.A. and her teenage daughter, Plaintiff P.J.C.V., are natives and citizens of El Salvador. They fled El Salvador with Ms. G.L.V.A.'s three-year-old daughter, P.J.C.V.'s sister, in order to save their lives. Ms. G.L.V.A. and her daughters were apprehended after they crossed the border into the United States, and are presently detained at the Artesia detention facility. In El Salvador, Ms. G.L.V.A. suffered repeated violence at the hands of her ex-husband, who beat her while she was pregnant, assaulted her on repeated occasions, and threatened to kill her if she left him or tried to seek help from the police. Ms. G.L.V.A. and her family also became the targets of gang members who control the area where she lived. They demanded money from Ms. G.L.V.A. and threatened her two daughters. After she made one payment, they left her alone for a brief period, but later renewed their threats. In addition, gang members sexually assaulted her daughter P.J.C.V. and only stopped their ongoing assault because of a bystander's desperate efforts to intervene. Based on the harm her ex-husband inflicted on her, and the gang's threats and assaults against her and her family, Ms. G.L.V.A. fears for her and her daughters' lives if they are forced to return to El Salvador. Despite the substantial risk of persecution the family faces in El Salvador, and as a result of Defendants' unlawful policies and procedures, Plaintiff G.L.V.A. received a negative determination from an asylum officer. Plaintiff P.J.C.V. has never received a separate asylum evaluation, even though she has an independent reason for fearing persecution in El Salvador. The family is attempting to secure reconsideration of their case.

16. Plaintiff E.O.Z. is a Salvadoran mother who, along with her 11-year-old daughter, Plaintiff P.O., fled her native country.  She and her daughter were apprehended after they crossed the border into the United States, and were previously detained at the Artesia detention facility. Ms. E.O.Z. and her daughter have faced repeated death threats by a violent gang known as the "Maras" because Ms. E.O.Z.'s husband is a police officer who has refused to join forces with the gang, and because Ms. E.O.Z. herself is a shop owner who has refused to pay money to the Maras in order to keep operating her business.  She believes that if she and her daughter are returned to El Salvador, the Maras will carry out their threats against them.  Just hours after Ms. E.O.Z. and her daughter fled their home, members of the Maras shot at their home.  Despite the substantial risk of persecution she and her daughter face in El Salvador, and as a result of Defendants' unlawful policies and procedures, Plaintiff E.O.Z. received a negative determination from an asylum officer, which has been affirmed by an immigration judge.  At no time has P.O. received a separate asylum evaluation, even though she has directly been the target of threats from the Maras, and thus she has an independent basis for her fear of return to El Salvador.

17. Plaintiff M.R.R. is a Honduran mother who fled repeated death threats in her home country to seek asylum in the United States with her two young children.  She and her children were apprehended after they crossed the border into the United States, and are presently detained at the Artesia detention facility.  The same individuals who have threatened Ms. M.R.R. have already killed her partner, who is the father of her children.  Her partner was stabbed to death by a violent group that the Honduran police are unable or unwilling to control.  The group knew of Ms. M.R.R. and, because of her relationship to her partner, repeatedly threatened to kill her and her children.  She and her children received death threats from the group on a weekly basis while they remained in Honduras.  Ms. M.R.R. believes that if she and her children are returned to

Honduras, it is likely the group will carry out their threats against her family.  She and her children have received a negative determination from an asylum officer, which has been affirmed by an immigration judge, and are in the process of obtaining a re-evaluation.

18. Plaintiff C.M.R. is a native and citizen of El Salvador.  She came to the United States with her seven-year-old son, fleeing abuse at the hands of her ex-husband.  She and her son were apprehended after they crossed the border into the United States, and are presently detained at the Artesia detention facility.  After routinely suffering beatings from her ex-husband for the two years they were together, Ms. C.M.R. eventually divorced him and went to live with her grandmother.  Her ex-husband found her there, however, and continued to threaten her.  For example, on one occasion, he drove to Ms. C.M.R.'s house while drunk, looking for their son.  When she refused to let him take their son, he pointed a gun at her and threatened to kill her.  She filed a police report about this incident, but the police told her they closed the case after being unable to find her ex-husband within 24 hours.  On another occasion, just two weeks before Ms. C.M.R. fled El Salvador, her ex-husband approached her, called her "trash," and threatened to "disappear" her.  Fearing that her ex-husband will gravely harm her and her son if she remained in El Salvador, Ms. C.M.R. fled to the United States with her son.  Despite the substantial risk of persecution she and her seven-year-old son face in El Salvador, and as a result of Defendants' unlawful policies and procedures, Plaintiff C.M.R. received a negative determination from an asylum officer, which has been affirmed by an immigration judge.  She is in the process of attempting to obtain a new credible fear determination.

19. Plaintiff R.E.C.G. and her five-year-old son fled violence from the Mara Salvatrucha gang in El Salvador.  After Plaintiff R.E.C.G. and her son entered the United States, they were transported to a detention facility in San Diego, where an immigration officer specifically told

her not to claim she feared being returned to El Salvador because if she were to do so, she would

face continued detention at the San Diego facility.  The immigration officer also told her that as

to any claims she might make about fear of being returned, an immigration judge would not care

and would order her deported.  Despite the substantial risk of persecution she and her son face in

El Salvador, and as a result of Defendants' unlawful policies and procedures, Plaintiff R.E.C.G.

was never granted a credible fear interview until weeks after she arrived at Artesia, where she

and her son are now detained.  Plaintiff R.E.C.G. is in the process of attempting to obtain a

credible fear evaluation.

    20. Plaintiff B.C.M. and her 12-year-old son, Plaintiff J.R.C.C., are natives and citizens of El

Salvador.  They, along with Ms. B.C.M.'s five-year-old son, fled after becoming the targets of

gang members.  Ms. B.C.M. and her two children were apprehended after they crossed the

border into the United States, and are presently detained at the Artesia detention facility.  Ms.

B.C.M. and her husband were the targets of repeated threats and extortion attempts by a gang

that controls the area where they lived.  When they refused to give into the gang's demands, the

gang began intimidating her family.  They also threatened to take away her son J.R.C.C., and

threatened and followed him every time he left the house.  The threats and intimidation

eventually became so severe that her husband had to flee their home for his safety.  Ms. B.C.M.,

fearing for her safety and that of her two young children, fled the country.  She believes that if

she and her sons are forced to return to El Salvador, the gangs will kill J.R.C.C.  Despite the

substantial risk of persecution she and her children face in El Salvador, and as a result of

Defendants' unlawful policies and procedures, Plaintiff B.C.M. received a negative

determination from an asylum officer, which has been affirmed by an immigration judge.  The

family is attempting to secure reconsideration of their case.

21. Defendant Jeh Johnson is sued in his official capacity as the Secretary of the Department of Homeland Security ("DHS").  In this capacity, he directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP").  As a result, in his official capacity, Defendant Johnson is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiffs.

22. Defendant Eric H. Holder, Jr., is sued in his official capacity as the Attorney General of the United States.  In this capacity, he is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, oversees the Executive Office for Immigration Review ("EOIR"), is empowered to grant asylum or other relief, and is a legal custodian of the Plaintiffs.

23. Defendant Thomas S. Winkowski is sued in his official capacity as the Principal Deputy Assistant Secretary for ICE, which is the sub-agency that operates and oversees the Artesia detention facility; he is a legal custodian of the Plaintiffs.

24. Defendant Leon Rodriguez is sued in his official capacity as the Director of USCIS, which is the sub-agency that, through its asylum officers, conducts interviews of certain individuals placed in expedited removal to determine whether they have a credible fear of persecution and should be permitted to apply for asylum.  USCIS asylum officers conduct credible fear interviews at the Artesia detention facility.

25. Defendant R. Gil Kerlikowske is sued in his official capacity as the Commissioner of CBP, the sub-agency responsible for the initial processing and detention of noncitizens who are apprehended near the border and placed in expedited removal proceedings.

26. Defendant Martin E. Zelenka is sued in his official capacity as the ICE Acting Director for the Artesia Family Residential Center in Artesia, New Mexico, and he is a legal custodian of the Plaintiffs.  He is also an Acting Assistant Field Office Director for the ICE Florence Service Processing Center.

## BACKGROUND

### A.  Statutory Background.

27.   Broadly speaking, there are two main systems governing the removal of noncitizens from the United States.  One is the standard process in which a noncitizen is placed into removal proceedings under 8 U.S.C. § 1229, INA § 240.  Under that system, the noncitizen receives a full (INA § 240) hearing before an Immigration Judge ("IJ"), followed by an administrative appeal to the Board of Immigration Appeals ("BIA" or "Board").  Noncitizens may then seek judicial review of an adverse administrative decision by filing a petition for review in the court of appeals for the Circuit in which their immigration judge completed proceedings.  8 U.S.C. § 1252(a)-(b).  During this process, noncitizens may apply for asylum and have that claim heard along with any other claim they wish to bring.

28.   The instant case concerns the other system of removal, called the "expedited removal" process, created by Congress in 1996.  8 U.S.C. § 1225 *et seq.* (setting forth the expedited removal system).  In particular, this case concerns the government's creation of a new, revised expedited removal system for use in cases involving recently arrived Central American families.

29.   As enacted by Congress, the expedited removal system involves a more streamlined process than regular INA § 240 removal proceedings and is reserved for people apprehended at or near the border.  *See* 8 U.S.C. § 1225(b)(1)(A)(i) (permitting certain persons who are seeking admission at the border to the United States to be expeditiously removed without a full INA

§ 240 immigration judge hearing); 8 U.S.C. § 1225(b)(1)(A)(iii) (authorizing the Attorney

General to apply expedited removal to certain inadmissible noncitizens located within the United

States); 69 Fed. Reg. 48,877 (Aug. 11, 2004) (providing that the Attorney General will apply

expedited removal to persons within the United States who are allegedly apprehended within 100

miles of the border and who are unable to demonstrate that they have been continuously

physically present in the United States for the preceding 14-day period).

30.   Critically, however, Congress included safeguards in the expedited removal statute to

ensure that refugees are not mistakenly returned to face persecution.  Congress recognized the

high stakes involved in short-circuiting the formal IJ removal process, and the constitutional

constraints under which it operated, and created very specific procedures to adjudicate expedited

removal cases—with particularly detailed requirements for handling asylum claims.

31.   The expedited removal statute provides that the process begins with an inspection by an

immigration officer, who makes a determination about the individual's admissibility to the

United States.  But, of particular relevance here, if the individual indicates either an intention to

apply for asylum or *any* expression of fear of return to his or her home country, the immigration

officer *must* refer the individual for an interview with an asylum officer.  8 U.S.C.

§ 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4).  Because Plaintiffs have expressed such fears,

they are entitled under the law to a meaningful interview during which they can present their

claims.

32. Under the applicable regulations, after a noncitizen is referred for an interview, the

asylum officer then conducts a "credible fear interview," which is designed "to elicit all relevant

and useful information bearing on whether the applicant has a credible fear of persecution or

torture."  8 C.F.R. § 208.30(d).

13

33. The asylum officer must "conduct the interview in a nonadversarial manner, separate and apart from the general public."  8 C.F.R. § 208.30(d).  If the asylum officer determines that an individual "is unable to participate effectively in the interview because of illness, fatigue, or other impediments, the officer may reschedule the interview."  8 C.F.R. § 208.30(d)(1).  The asylum officer is required to "determine that the alien has an understanding of the credible fear determination process."  8 C.F.R. § 208.30(d)(2).

34.  The statute and the regulations further provide that the noncitizen has a right to "consult with a person or persons of the alien's choosing prior to the interview or any review thereof."  8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4).  "Any person or persons with whom the alien chooses to consult may be present at the interview," and may be allowed to present a statement at the end of the interview.  8 C.F.R. § 208.30(d)(4).  If the noncitizen "is unable to proceed effectively in English," and the asylum officer "is unable to proceed competently in a language chosen by the alien," the officer "shall arrange for the assistance of an interpreter in conducting the interview."  8 C.F.R. § 208.30(d)(5).

35.  At the conclusion of the interview, the asylum officer must create a written summary of the "material facts" provided during the interview, review that summary with the individual, and provide him/her with the opportunity to correct any errors.  8 C.F.R. § 208.30(d)(6).  If the asylum officer makes a negative credible fear determination, the officer must provide a written record of the determination and, upon request, the individual must be provided with prompt review of the determination by an immigration judge.  8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1).

36. The immigration judge "may receive into evidence any oral or written statement which is material and relevant to any issue in the review."  8 C.F.R. § 1003.42(c).  The statute specifies

that the IJ review must include an opportunity for the individual "to be heard and questioned by the immigration judge, either in person or by telephonic or video connection."  8 U.S.C. § 1225(b)(1)(B)(iii)(III).

37.  To prevail ultimately on an asylum claim, the applicant need only establish that there is a 10 percent chance that he or she will be persecuted on account of one of the listed grounds.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431-32 (1987).  Among the listed grounds that qualify one for asylum is a well-founded fear of persecution based on membership in a particular social group, which can include a group based on gender or persecution by gangs.  *See*, *e.g.*, *Crespin-Valladares v. Holder*, 632 F.3d 117, 125-26 (4th Cir. 2011) (recognizing that persecution based on one's relationship to a family member targeted by gangs is a cognizable basis for asylum); *Perdomo v. Holder*, 611 F.3d 662, 667 (9th Cir. 2010) (concluding that "women in a particular country, regardless of ethnicity or clan membership, could form a particular social group").  An "applicant for asylum has established a well-founded fear if he shows that a *reasonable person* in his circumstances would fear persecution."  *Matter of Mogharrabi*, 19 I&N Dec. 439, 445 (BIA 1987) (emphasis added).  An applicant who cannot show persecution on account of a protected ground can still be granted relief under the Convention Against Torture ("CAT") if there is a greater than 50 percent chance that he or she would face torture at the hands of a group the government cannot control, including gangs or organized crime.  *See*, *e.g.*, *Madrigal v. Holder*, 716 F.3d 499, 509-10 (9th Cir. 2013); *Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009) (finding that torture by Mexican drug cartel is a cognizable basis for CAT relief).

38.  The standard is even lower at the initial stage of the credible fear interview.  Congress provided that to prevail in a *credible fear* screening under the expedited removal process, applicants need not establish their ultimate entitlement to asylum, *i.e.*, a 10 percent chance of

being persecuted.  Rather, to establish a "credible fear," the applicant need only show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).  Thus, to establish "credible fear," and thereby be allowed to pursue one's application for asylum before an immigration judge in a full INA § 240 hearing, applicants need only show a *significant possibility* that there is a *10 percent chance* of persecution if they are returned to their home country.  Or put another way, the applicant need only show a significant possibility that a reasonable person in his or her circumstances would fear persecution.

39.  Applicants who satisfy the low threshold for credible fear are taken out of the expedited removal system altogether and placed into the regular (INA § 240) removal process, where they have the opportunity to develop a full record before an IJ, and may appeal an adverse decision to the BIA and court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

40.  Statistics released by USCIS show that between October 2013 and June 2014, approximately 77 percent of individuals in the expedited removal process nationwide who were referred for credible fear interviews were able to satisfy the "credible fear" standard.[2]

41.  The reason for the low threshold at the credible fear stage is straightforward.  An asylum claim is highly fact-specific and often will take a significant amount of time and resources to develop properly, including expert testimony and extensive country conditions evidence.  It is thus highly unrealistic for applicants in the expedited removal system, especially if unrepresented, to present an adequate asylum claim while in detention and under severe time constraints.  Accordingly, by establishing a low threshold at the credible fear stage, Congress

---

[2] USCIS Credible Fear and Reasonable Fear FY14, Credible Fear Workload Report Summary, *available at* http://www.uscis.gov/sites/default/files/USCIS/Outreach/Credible_Fear_and_Reasonable_Fear_FY14_Q3.pdf.

made sure that potentially valid asylum claims could be developed properly and presented in a full INA § 240 hearing before an IJ, with a statutorily mandated appeal process should the applicant receive an adverse decision.

42. As described below, however, Defendants have imposed policies and procedures that have deprived Plaintiffs and other Artesia detainees of the meaningful opportunity to present their claims, as required under the law.

**B.  The Artesia Detention Center in New Mexico**

43.  In recent months, the flow of Central Americans seeking refuge in the United States has increased significantly.  The majority of these families and children are from El Salvador, Honduras, and Guatemala.  Many of these recent migrants—like Plaintiffs—are asylum seekers who face persecution and extreme danger in their home countries.[3]

44.  The United States is not the only country in the region receiving asylum seekers from El Salvador, Honduras, and Guatemala.  Over the past five years, the United Nations High Commissioner for Refugees ("UNHCR") has documented a 712 percent increase in asylum applications from these countries filed in Mexico and in the other Central American countries.[4] According to the UNHCR, 58 percent of children interviewed from El Salvador, Honduras, Guatemala, and Mexico were identified as having potential international protection needs.

---

[3] *See, e.g.*, Alberto Arce & Michael Weissenstein, *U.N. Enters Immigration Debate, Pushes for Fleeing Central Americans to Be Treated as Refugees*, HUFFINGTON POST, (July 8, 2014, 12:03 AM), *available at* http://www.huffingtonpost.com/2014/07/08/un-enters-immigration-debate_n_5565807.html; U.N. High Comm'r for Refugees, *Children on the Run*: *Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection*, (Mar. 2014) [hereinafter UNHCR, *Children on the Run*].
[4] *See* UNHCR, *Children on the Run* (updated statistics available at http://unhcrwashington.org/children).

45. It has been reported that since February alone, between five and ten children deported to Honduras by the United States have been killed.[5]

46.  In response to this recent flow of Central American families and children entering the United States, the government has created a new further-accelerated and results-oriented expedited removal system that deprives asylum applicants of their constitutional, statutory, and regulatory rights to a fair and meaningful hearing.

47.  To carry out the new expedited removal policies, DHS established a makeshift detention center on the grounds of the Federal Law Enforcement Training Center in Artesia, New Mexico, a remote location more than three hours' drive from the nearest major city and resources critical to asylum seekers, including legal services.  The Artesia facility can hold a maximum of 672 individuals.  All family units detained at Artesia are comprised of a mother and one or more children; no men are detained there.  The children detained at Artesia range in age from newborn infants to teenagers, with an average age of six years old.

48.  Like Plaintiffs, many of the families detained at Artesia fear violence and persecution and would have viable asylum claims if given a meaningful opportunity to pursue them.  But because of the new expedited removal policies and procedures, Plaintiffs and numerous other detainees with bona fide asylum claims have been erroneously prevented from pursuing them.

**C.  The New Expedited Removal Policies and Procedures**

49.  The new expedited removal system was first implemented at the Artesia facility on or after June 27, 2014, the date that the first women and children were detained there.[6]  The new

---

[5] Cindy Carcamo, *In Honduras, U.S. Deportees Seek to Journey North Again*, LOS ANGELES TIMES, August 16, 2014, *available at* http://www.latimes.com/world/mexico-americas/la-fg-honduras-deported-youths-20140816-story.html?utm_content=buffer7c073&utm_medium=social&utm_source=twitter.com&utm_campaign=buffer.

policies are set forth in a June 30, 2014 letter from President Obama to Congress[7] and in written

Congressional testimony by DHS Secretary Johnson on July 10, 2014.[8]  Upon information and

belief, the new policies and procedures are also set forth in numerous other written directives and

memoranda.  Upon information and belief, Defendants would have promulgated numerous new

policies and procedures in writing in order to establish a new detention facility for expedited

removal processing; it is impossible that such a system could be implemented without written

policies.  At a minimum, Defendants would have had to establish procedures describing how the

credible fear process would operate with on-site asylum officers, and how immigration judges

would conduct hearings remotely, as well as numerous other policies governing matters such as

legal visitation, telephone access, provision of legal rights information, and employee staffing.

*See*, *e.g.*, ICE Family Residential Detention Standards, Visitation, Consultation Visits for

Residents Subject to Expedited Removal, § 5.8.11(a) (2008) (providing that "each [detention]

facility shall develop procedures" for consultation visitation for noncitizens in expedited

removal).  Counsel for Plaintiffs have obtained at least one such written policy, and have sought

---

[6] *More Than 100 Immigrants at Artesia Center*, LAS CRUCES SUN-NEWS, July 1, 2014, *available at* http://www.lcsun-news.com/las_cruces-news/ci_26069336/more-than-100-immigrants-at-artesia-center; Timothy P. Howsare, *Central American Immigrants Now at FLETC*, ROSWELL DAILY RECORD ONLINE, July 1, 2014, *available at* http://rdrnews.com/wordpress/blog/2014/07/01/central-american-immigrants-now-at-fletc/ (reporting that 168 Central American women and children arrived at the Artesia detention facility on Friday, June 27, 2014).

[7] *See* Letter to Congress, President Barack H. Obama, Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border (June 30, 2014), *available at* http://www.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-address-humanitarian-situation-rio-grande-valle [hereinafter Pres. Obama's June 30, 2014 Letter to Congress].

[8] *Hearing on the Review of the President's Emergency Supplemental Request for Unaccompanied Children and Related Matters, Before the S. Comm. on Appropriations* (July 10, 2014) (statement of Jeh Johnson, Sec'y of Homeland Sec. of the United States), *available at* http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations [hereinafter July 10, 2014 Written Statement of Sec'y Johnson].

additional written directives and memoranda through an expedited Freedom of Information Act ("FOIA") request to DHS and EOIR, but the government summarily denied the request for expedited processing.  An appeal of that denial, as well as the FOIA request itself, remains pending as of the filing of this lawsuit.

50. The overarching goal of the new expedited removal system is not to provide a fair asylum process, but to remove the Central American mothers and children at Artesia as quickly as possible and to deter any future significant migration from that region.  To achieve this goal, the government has implemented several changes to the expedited removal system.  Those changes fall into two broad categories.  The first is a decision to limit the number of Central American women and children who are granted asylum regardless of the individual merits of their claims, in part by applying a more stringent—and legally erroneous—credible fear standard.  The second set of changes is procedural.  Even if the adjudicators at Artesia were applying the correct substantive legal standard for credible fear determinations, the government has created a series of procedural obstacles that make it significantly more difficult for applicants to present their cases.

### The Substantive Changes

51. As with other disfavored groups in the past who have sought refuge in the United States, such as Haitians fleeing a brutal dictatorship in the 1980s and 1990s, or Salvadorans and Guatemalans fleeing persecution in the mid-1980s, the government has made a decision—in advance of individual hearings—that it will deny most of the asylum claims made by the recent Central American migrants.[9]  These Central American women and children are now subject to a

---

[9] *See Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023 (5th Cir. Unit B 1982) (holding that the Immigration and Naturalization Service ("INS") effectively denied Haitian detainees their right to petition for asylum by instructing immigration judges to hold fifty-five hearings a day rather than one, shortening asylum interviews from an hour and a half to fifteen minutes, and giving immigration attorneys impossible schedules); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988) (holding that INS was permanently enjoined from forcing Salvadoran detainees

policy that effectively denies them the right to have their cases judged on their individual merits under existing law.  As a result, asylum officers and immigration judges have been applying a substantively more demanding—and unlawful—credible fear standard to these individuals' claims.

52.  The new expedited removal policy at Artesia was outlined by President Obama in a June 30, 2014 letter to Congress, which stated that the government had adopted "an aggressive deterrence strategy focused on the removal and repatriation of recent border crossers."[10]  The President accordingly directed DHS to take "aggressive steps to surge resources to our Southwest border to deter both adults and children from this dangerous journey … and quickly return unlawful migrants to their home countries."[11]  The June 30 letter further stated that the Administration would establish new facilities specifically "to expedite the processing of cases involving those who crossed the border in recent weeks."[12]

53.  Consistent with the objectives outlined in the June 30 letter, the Administration has repeatedly signaled that the outcome of the removal process for these Central American migrants is all but predetermined, stating that few of these women and children would be granted asylum. Remarkably, high-level Administration officials have made such statements without regard to the individual circumstances of each detainee.

54. For example, prior to the arrival of the first women and children at Artesia, Vice President Biden set the stage for the treatment of these Central American families during a press

---

to sign voluntary departure agreements and subjecting them to other abusive practices); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) (upholding permanent injunction and ordering INS to provide Salvadoran detainees notice of their rights to political asylum and access to counsel); *Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (settlement decree in class action regarding biased adjudication of Guatemalan and Salvadoran asylum applications, including requiring reconsideration of approximately 250,000 applications).

[10] Pres. Obama's June 30, 2014 Letter to Congress.

[11] *Id.*

[12] *Id.*

briefing in Guatemala, when he stated that "***none*** of these children or women bringing children will be eligible under the existing law in the United States."[13]

55. Further, in early July 2014, during a tour of the Artesia detention facility shortly after it opened, Secretary Johnson stated directly: "This facility . . . represents proof that indeed we will send people back."[14]  Similarly, testifying to Congress in early July, he stated: "Our message is clear to those who try to illegally cross our borders: you will be sent back home."[15]  And specifically addressing the "adults who brought their children with them," Secretary Johnson stated bluntly, "Again, our message to this group is simple: we will send you back."[16]  These statements were not made about specific cases at the conclusion of a factual hearing, but rather as a general statement, without regard to how many people genuinely had valid asylum claims under the law.

56. Secretary Johnson summed up the new policy: "The goal of the Administration is to stem the tide and send the message unequivocally that if you come here you will be turned around."[17]  The priority is to deter future would-be asylum-seekers by "show[ing] others in Central America that we are returning people."[18]  According to Johnson, new facilities, such as Artesia, were built specifically to accomplish this quickly.[19]

---

[13] Vice President Joseph Biden, Remarks to the Press and Question and Answer at the Residence of the U.S. Ambassador, Guatemala City, Guatemala (June 20, 2014) (emphasis added), *available at* http://www.whitehouse.gov/the-press-office/2014/06/20/remarks-press-qa-vice-president-joe-biden-guatemala.

[14] Juan Carlos Llorca, *DHS Secretary Visits Artesia, N.M, Facility; Warns Immigrants 'We Will Send You Back,'* EL PASO TIMES, July 11, 2014, *available at* http://www.elpasotimes.com/latestnews/ci_26128803/dhs-secretary-visit-artesia-nm-migrant-detention-center.

[15] July 10, 2014 Written Statement of Sec'y Johnson.

[16] *Id*.

[17] Interview with Secretary of Homeland Security Jeh Johnson, NBC News, Meet the Press, July 6, 2014 (video).

[18] *Hearing on the Review of the President's Emergency Supplemental Request for Unaccompanied Children and Related Matters, Before the S. Comm. on Appropriations* (July 10, 2014), *available at* http://www.appropriations.senate.gov/webcast/full-committee-hearing-

57. In addition to their DHS counterparts, Department of Justice officials echoed the Administration's position that they "must do whatever [they] can to stem the tide."[20]

58. Likewise, State Department officials have categorically stated that the violence and threats faced by these Central American families do not qualify them for asylum.  In response to a query as to whether the United States should be deporting Central American families, a State Department official answered that "under international laws, these are not places that are war zones, despite the high level of insecurity" and thus "it's [not] a question of should we be returning them."[21]

59. This categorical prejudgment, and the rush to that judgment in individual cases, is reflected in the removal process newly implemented at Artesia.  A senior ICE official indicated during a late June tour of the Artesia facility, "the goal is to process the immigrants and have them deported within 10 to 15 days to send a message back to their home countries that there are consequences for illegal immigration."[22]

60. Secretary Johnson reiterated this point in his July 10, 2014, testimony before Congress about the Artesia facility, making clear that the government had not only prejudged these claims, but that it intended to deny the claims quickly:  "We are building additional space to detain these groups and hold them until their expedited removal orders are effectuated.  Last week we opened

president%E2%80%99s-emergency-supplemental-request (oral testimony of Sec'y of Homeland Security Jeh Johnson).

[19] *Id.*

[20] Press Release, Department of Justice, Department of Justice Announces New Priorities to Address Surge of Migrants Crossing Into the U.S. (July 9, 2014), *available at* http://www.justice.gov/opa/pr/2014/July/14-dag-711.html.

[21] Background Briefing from the Senior U.S. Department of State Official on Secretary Kerry's Trip to Panama (July 1, 2014), *available at* http://m.state.gov/md228646.htm.

[22] *Officials: NM Detention Center Will Be Focused On Deporting Illegal Immigrants Within 15 Days*, CBS DC, (June 27, 2014 6:48 AM), *available at* http://washington.cbslocal.com/2 014/06/27/officials-nm-detention-center-will-be-focused-on-deporting-illegal-immigrants-within-15-days/.  According to the same article, "The official spoke on condition of anonymity because he was not allowed to talk publicly citing agency policy."  *Id.*

a detention facility in Artesia, New Mexico for this purpose, and we are building more detention

space quickly.  Adults who brought their children here expecting to make it to the nearest bus

station in the U.S. were surprised that they were detained at Artesia.  They will be sent back

quickly . . . ."[23]  Secretary Johnson has gone so far as to state that the goal is to process and

deport these families in just "a couple of days."[24]

61. Consistent with these statements, the Principal Deputy Assistant Secretary for ICE has

testified that, at Artesia, "removal hearings are moving much quicker" and "that sends a deterrent

message."[25]

62. Recent statistics released by USCIS demonstrate that this goal of sped-up deportation

proceedings is being met.  As of August 7, 2014, the average time for USCIS processing of

Artesia detainees from case opening through completion of a credible fear determination was

6.41 days.[26]

63. Upon information and belief, and consistent with the public statements of top officials,

and with corresponding written policies and directives, immigration officers staffing the Artesia

detention facility are aware of, influenced by, and actively carrying out the foremost goal of

---

[23] July 10, 2014 Written Statement of Sec. Johnson; *see also Hearing entitled Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border, Before H. Comm. on Homeland Sec.* (June 24, 2014) (statement of Jeh Johnson, Sec'y of Homeland Sec. of the United States).

[24] Milan Simonich, *Detention Center Puts Immigration Spotlight on New Mexico Town*, SANTA FE NEW MEXICAN, July 14, 2014, *available at* http://www.santafenewmexican.com/news/local_news/detention-center-puts-immigration-spotlight-on-new-mexico-town/article_e275dfb7-96f4-5e37-bf80-303b8a80b199.html [hereinafter Simonich].

[25] *Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Border. Hearing Before the S. Comm. on Homeland Sec. and Governmental Affairs* (July 9, 2014), *available at* http://www.hsgac.senate.gov/hearings/challenges-at-the-border-examining-the-causes-consequences-and-responses-to-the-rise-in-apprehensions-at-the-southern-border (statements of Thomas S. Winkowski, Principal Deputy Assistant Sec'y of U.S. Immigration and Customs Enforcement).

[26] USCIS Asylum Division, Artesia, New Mexico Statistics (through Aug. 7, 2014).

removing these Central American women and children as quickly as possible, without the proper scrutiny of the merits of their individual cases.

64. For example, during Secretary Johnson's tour of the Artesia facility, an ICE spokesperson affirmed the agency's position that the overwhelming majority of detainees would be deported, stating that the rate of deportation will likely be 95 percent.[27]  Similarly, federal officials at the Artesia facility reportedly advised the mayor of Artesia that 90 percent of the detainees would be deported.[28]

65. Further, earlier this week, an immigration officer said to a group of detainees, including Plaintiff M.R.R., "Obama wants you all to go back to your country."

66. In addition, on July 21, 2014, ICE Supervisory Detention and Deportation Officer Henry (Enrique) Davila, told a volunteer attorney in the "law library" at the Artesia detention facility, "I want you to know that all of these people are going to be deported," and that "our job is to get them all deported and there's maybe one in a thousand entitled to stay in the United States, and the rest are going to go."  The same ICE officer later told an attorney that it was his job to "move these people through here."

67. On another occasion, Officer Davila indicated that he would deny all requests for deferred action made on behalf of detainees at Artesia.  He also indicated that requesting a stay of removal was a waste of time and that he "would deny anything" that was filed.

68. Asylum officers and immigration judges handling credible fear cases of Artesia detainees are likewise aware of, influenced by, and actively carrying out the goal of removing these mothers and children as quickly as possible, without regard to the individual merits.  For example, an asylum officer told Plaintiff C.M.R. that the violent abuse inflicted on her by her

---

[27] Simonich, *supra*.
[28] *Id.*

husband during the time before their separation would not "count" toward her asylum claim, even though she was fleeing continued abuse at the hands of her domestic abuser, a form of persecution that DHS has recognized can provide a basis for asylum.

69. Similarly, the asylum officer conducting another detainee's credible fear interview expressed skepticism about why she had failed to report her husband's abuse to the Honduran police—in spite of the fact that another person had reported the abuse and the police had released her husband the day after he was arrested.  The asylum officer also repeatedly cut off the detainee when she tried to provide more detail about her fear, leaving her with the impression that the asylum officer was deeply biased and deeply disposed to making a negative determination.

70. It is common for asylum officers at Artesia to interrupt a detainee before she has completely answered a question.  Further, asylum officers at Artesia rarely ask in-depth follow-up questions that elicit information helpful and relevant to detainees' claims, as required by the applicable regulations.

71. Plaintiff E.O.Z. was repeatedly cut off by the asylum officer conducting her credible fear interview and was not allowed to fully explain her answers.  The interpreter during her interview also frequently made her stop talking, telling her "ya estuvo" ("it's finished").  This prevented her from fully explaining her fear of returning to El Salvador.  The asylum officer also recorded several of Ms. E.O.Z.'s answers incorrectly and did not give her an opportunity to correct the errors.  For example, the asylum officer's notes incorrectly state that Ms. E.O.Z. was only insulted, not directly threatened, by gang members.  In fact, Ms. E.O.Z. said that she and her daughter were directly *threatened* (and not just insulted) by gang members.

72. Plaintiff B.C.M. likewise was rushed through her interview by the asylum officer and not given a chance to tell her story.  Another detainee reports that "the asylum officer kept telling me to stop talking and to keep my answers short."

73. Defendants' disregard for the actual merits of individual cases is further reflected by asylum officers' and immigration judges' practice of requiring Artesia detainees to explain their fear of persecution in legal terms, without any explanation of what those terms mean, rather than simply requiring detainees to communicate their fears in lay terms.  For example, asylum officers have denied credible fear when an applicant is unable to articulate the "particular social group" in which they are members.  Yet the meaning of "particular social group"—one of the five protected statuses under the asylum statute—is an extremely complicated legal concept that has given rise to numerous conflicting court interpretations and is often the subject of expert testimony.  For example, mothers have been asked, and are expected to be able to accurately answer, questions such as, "Have you ever been harmed or threatened in El Salvador because you belong to a group that is seen as different or special by society in your home country?" or "Are you a member of a particular social group?"

74. Plaintiffs B.C.M. and E.O.Z. both were asked this type of question but did not understand what information the asylum officer or immigration judge was seeking.  They both received negative credible fear findings.  Indeed, Plaintiff E.O.Z. thought that she was being asked whether she belonged to a group of criminals or delinquents.  Similarly, as another detained mother has explained, when the asylum officer "asked whether I was targeted because of my political opinion, my race, my religion, or because I belong to a particular social group . . . . I did not understand those words so I answered no."

75. Understandably, most women detained at Artesia—the vast majority of whom are unrepresented by counsel—have no understanding of such technical legal questions and thus are unable to respond appropriately.

76. Immigration judges reviewing negative credible fear determinations have also applied Defendants' new policies.  For example, an immigration judge reviewing a negative credible fear determination issued to Plaintiff B.C.M. indicated that noncitizens fleeing gangs are categorically not entitled to asylum, even though such a claim has been recognized by courts. During the credible fear review hearing, the judge told Ms. B.C.M. that "people from all these countries come to the United States because of gangs and that is why they are not being granted asylum."  The judge further stated that "gangs are not a reason for [them] to stay," and then proceeded to tell Ms. B.C.M. that she was going to be deported.  The judge also repeatedly interrupted Ms. B.C.M. throughout the hearing, preventing her from providing details as to the basis of her fear.

77. Similarly, the immigration judge reviewing Plaintiff C.M.R.'s case did not did not permit her to fully explain her fear of domestic violence, a kind of fear that could qualify her for asylum.  Instead the judge told her that she "needed to find another solution in [her] own country."

78. Notably, legal experts who have reviewed credible fear cases of families detained at Artesia have observed that many cases were erroneously denied even though the detainee had a significant possibility of an asylum grant.  According to these experts, asylum officers and immigration judges at Artesia are applying a more stringent credible fear standard than has been applied in the past, one that is inconsistent with the standard that Congress contemplated when it established the expedited removal process.

79. Moreover, Defendants' new policies and procedures also seek to deter mothers and children from even applying for asylum in the first instance.

80. Prior to their detention at Artesia, Plaintiffs and other Central American asylum seekers were detained by CBP.  Agents of CBP have applied coercion to dissuade Plaintiffs and other asylum seekers from seeking legal counsel and otherwise asserting their rights through the legal process.  For example, CBP agents have advised these asylum seekers that they will certainly be deported, regardless of the circumstances that give rise to their individual fear of being persecuted or tortured if they are returned.

81. Similarly, at Artesia, immigration officers tell families that everyone detained at Artesia will be deported, and that while they can try to apply for asylum, doing so will just result in their lengthy detention and they will end up being deported anyway.

82. For example, Plaintiff E.O.Z. was told by officials that "if you're here [at Artesia] it's because you are going to be deported."  She heard officials repeatedly say that "no one is going to leave Artesia except to their home country."  Similarly, another detainee was told, upon her arrival at Artesia, that the detainees would be deported and that the reason they were present in Artesia was that they were going to be deported.  Another mother reports being told, "If you are detained here, you are going to be deported."  Similarly, an immigration officer told another detainee that if she fought her immigration case she would be detained at the Artesia facility for at least six months and potentially up to a year.  Another detainee has recounted that an ICE officer told her that if she fought her immigration case, the government would take her child away.

83. Plaintiff G.L.V.A. was told by an official at Artesia that the detainees have no rights. Another detainee was told by an ICE officer that if she did not sign papers allowing for her

deportation, she could go to jail for ten years and be separated from her son.  Similarly, an officer said to a detainee, "Why did you come to the United States? You only bought yourself some jail time."

84. These types of statements are designed to, and in fact do, discourage mothers and children from rigorously pursuing their legal rights and coerce them into abandoning their asylum claims.  As one mother detained at Artesia has explained, after hearing an immigration officer say that they were all going to be deported, she had difficulty explaining her fear of persecution because she thought the process was futile and she feared she would be deported no matter what she said.

85. As a result of the government's new policies, asylum officers and immigration judges are routinely denying bona fide credible fear claims, as reported by both volunteer immigration attorneys at the facility and academic asylum experts who have reviewed factual summaries of some of the cases processed to date.

86. Professor Deborah Anker, one of the world's leading asylum experts, has thus far reviewed the cases of nine of the Plaintiffs: C.M.R., G.L.V.A., P.J.C.V., B.C.M., J.R.C.C., M.S.P.C., E.O.Z., P.O., and M.R.R.  In her view, all of these individuals would easily receive positive credible fear determinations under the proper standard.

87. The fact that so many women and children at Artesia have indicated an intention to seek asylum is not surprising given the persecution they would face if the United States returns them to their home countries.  And the fact that so many of these women and children would have passed a credible fear screening if the proper standard had been applied is likewise not

surprising.  At the credible fear stage, they need only show a "significant possibility" that they

face a 10 percent chance of persecution if returned.[29]

88. But asylum officers are applying a far more stringent standard—a standard that cannot

possibly be met at the credible fear interview stage and that Congress did not intend for

applicants at that stage to meet.  And it is not just the asylum officers who are applying the

wrong credible fear standard.  Due to the prejudgment reflected in the Administration's

statements, policies, and directives, immigration judges reviewing adverse credible fear

determinations also are applying a credible fear standard that is improperly weighted against

applicants.

89. In short, the effect of these new policies and procedures on Central American families at

Artesia has been dramatic.  According to USCIS statistics, the rate of positive credible fear

findings nationwide was **77 percent** from March 2013 to June 2014, just prior to Artesia's

opening.[30]  In stark contrast, the credible fear grant rate at Artesia during the first seven weeks

that the facility was in operation was only **37.8 percent**—about *half* the average pass rate.[31]

### Procedural Changes

90.   The government's new policies at Artesia also create a host of procedural obstacles for

asylum applicants, in violation of due process, the immigration statute, and the governing

regulations.

91.   As an initial matter, the government has placed these mothers and children at a location

far from pro bono counsel, family, and other resources: the Artesia facility is three to four hours

---

[29] 8 U.S.C. § 1225(b)(1)(B)(v).
[30] USCIS Credible Fear and Reasonable Fear FY14, Credible Fear Workload Report Summary, *available at* http://www.uscis.gov/sites/default/files/USCIS/Outreach/Credible_Fear_and_Reasonable_Fear_FY14_Q3.pdf.
[31] USCIS Asylum Division, Artesia, New Mexico Statistics (through Aug. 7, 2014).

by car from the nearest major metropolitan areas, El Paso, Texas, and Albuquerque, New Mexico (and from corresponding major metropolitan airports).

92. Mothers and children detained at Artesia are severely impacted by the profound isolation imposed by Defendants.  Many mothers are in a state of despair, with an overwhelming concern for the health of their children.  These families have been deeply affected by depression, trauma, and other mental health issues suffered by individuals fleeing violence, as well as by exhaustion and numerous other physical health challenges (including diarrhea and chicken pox).  At the same time, they are expected to defend their rights, generally without the assistance of counsel, during accelerated removal proceedings in which their lives and futures—and those of their children—are at stake.

93.  The isolation at Artesia exacerbates the procedural obstacles created by the new expedited removal policies.

**Severely Restricted Telephone Access**

94. Although the law requires detainees to be permitted phone access so they can try to find counsel on their own through family and other contacts, the Artesia families have extremely limited access to telephones.  The expedited removal statute and regulations specifically contemplate that a noncitizen has the right to "consult with a person or persons of the alien's choosing prior to the interview or any review thereof," 8 U.S.C. § 1225(b)(1)(B)(iv), and that such persons "may be present at the interview," and may be allowed to present a statement at the end of the interview, 8 C.F.R. § 208.30(d)(4).  Defendants' policies and procedures regarding telephone access effectively negate these families' right to consult with and obtain assistance from others, including counsel.

95. For example, detainees are told they can only make one time-limited telephone call per day.  Detainees therefore have to decide between calling their attorney or their family.  Moreover, if a detainee is unable to reach someone, they are unable to try again until the next day.  This is particularly problematic as immigration officers sometimes permit the single call during a certain time of day, which may be outside business hours, when attorneys' offices are inaccessible by telephone.  Although some detainees have been permitted 15-20 minutes for a call, detainees are routinely told by ICE officers that they have only 3-5 minutes for each call.

96. One detained mother was reportedly told that she had five minutes to speak to her attorney on the phone.  As the mother rushed to share details about her fear of returning to El Salvador, her attorney could hear the ICE officer in the background saying, "Your time is up.  Your time is up."  Another detainee had her call to her lawyer cut off by a guard after 9 minutes and 39 seconds.  As another detained mother summed up the situation: "Officers control when you can use the telephone and even when I was able to use the telephone, they would cut me off after three or five minutes."

97. All of the Plaintiffs have been subject to such restrictions on their phone use.  Indeed, earlier this week, an immigration officer forced Plaintiff M.S.P.C. to end her call with counsel in the instant case after only 3 minutes and 39 seconds.  Plaintiffs M.R.R. and B.C.M. have similarly had their calls cut off by ICE officers while they were in the midst of speaking to or attempting to reach an attorney.

98. Similarly, although Plaintiff M.S.P.C.'s family had retained a lawyer for her, she was unable to speak with the lawyer prior to having her negative credible fear determination reviewed by an immigration judge.  ICE officers allowed her only one chance each day to reach

her attorney and did not permit her to try again until the next day.  Ultimately, her hearing took place without her attorney's assistance or presence.

99. Detainees, including Plaintiffs M.R.R. and E.O.Z., have been told by ICE officers that they are only allowed one call per day, but that they may earn a second daily call as a quid pro quo for cleaning the bathroom.

100.      The ability of these detained mothers to obtain and consult with counsel is also undermined because they have little or no privacy while making telephone calls and because it is impossible to telephone detainees directly and messages are not delivered in a timely fashion.

**Inadequate Legal Rights Information**

101.      Compounding the fact that detainees are precluded from communicating effectively with the outside world is that Defendants' new policies and procedures also fail to provide families at Artesia with basic legal information, and as a result, many if not most detainees are completely unaware of their legal rights.  Mothers are routinely told to sign forms they do not understand.  Families are not provided with meaningful explanations of their rights and of what is being determined during the expedited removal or credible fear interview process.  And, as noted above, immigration officers routinely tell mothers and children that they will certainly be deported, contrary to U.S. law, which provides a legal process for individualized determination of the right to remain.

102.      None of the Plaintiffs has received adequate information about their legal rights.  For example, no official at Artesia told Plaintiff R.E.C.G. that she had a right to a credible fear interview if she feared return to her country, and she has no recollection of receiving any information about her rights.

103.     Similarly, Plaintiffs C.M.R., M.S.P.C., and E.O.Z. were never given any written explanation of their rights.  Although some detainees receive a resident handbook about Artesia, it does not explain detainees' rights to consult with legal counsel or to pursue an asylum claim. As a result, Plaintiffs and other detainees have gone into their credible fear interviews without knowing what to expect or understanding what rights they had.

104.     Making matters worse, the Artesia "law library" does not provide detained families with adequate access to legal materials in Spanish.  Indeed, the "library" contains no books at all.  Although the "library" affords computer access to Lexis/Nexis, it does not contain any Spanish-language documents, information on country conditions, or other materials.  In fact, Plaintiff M.R.R. was told that she is not even allowed to go to the "library" to use a computer; she was told she could only go to the "library" if she was going to meet with a lawyer.

105.     Until recently, the only legal rights orientation provided by Defendants to the Artesia families was by means of a short video shown upon initial arrival.  Yet most detainees, including Plaintiffs, were so exhausted after being transported several hours to Artesia, and so distracted by the need to care for their exhausted and hungry children, that they have no recollection or understanding of any information contained in the video.

106.     The first live legal orientation program at Artesia was conducted by a non-profit legal services organization on or about Friday, July 18.  Such legal orientations have been cut short by officials at the facility (with one presentation terminated after only 20 minutes).  The presentation reportedly only addresses U visas and potential immigration relief under the Violence Against Women Act, two types of immigration relief for which women and children who recently arrived in the United States are unlikely to qualify.  Finally, because of the speed at which the expedited removal process at Artesia is being conducted, many families do not have

the opportunity to attend a legal orientation program before they have their credible fear

interviews.

**Barriers to Consulting with Counsel**

107.     Although they have a legal right to consult with any person, including an attorney,

most mothers and children at Artesia, including Plaintiffs, have been unable to secure the

assistance of an attorney prior to their credible fear interviews and immigration judge review

hearings.

108.     The Artesia detention center is located hours away from most legal services.

There are no immigration attorneys regularly based in the vicinity of Artesia and immigration

practitioners must travel a long distance to meet with clients there.  Attorneys driving in from

Albuquerque must make an eight-hour round trip drive to meet a client at Artesia; attorneys

driving in from El Paso must make a six- to seven-hour round trip drive.  Upon information and

belief, there is only one Spanish-speaking attorney whose practice is located within a 40-mile

radius of the facility, and that attorney does not practice immigration law.

109.     Moreover, the legal services list that Defendants provide to detainees at Artesia

does not contain a single attorney or organization that can undertake their representation.  The

list contains only three legal services providers—all located several hours away in El Paso,

Texas, none of which has capacity to represent noncitizens at Artesia in their immigration cases.

Indeed, the legal services list indicates on its face that one of the listed organizations "[w]ill not

represent aliens in asylum or refugee cases," and states that a second organization will take cases

from the "El Paso Service Processing Center only"—excluding families detained at Artesia.

**Policies Restricting Detainees' Ability to Meet with Lawyers**

110.     Although some volunteer immigration attorneys have recently been providing legal assistance to a small proportion of the families at Artesia, most families at Artesia are unrepresented by counsel during critical stages of the expedited removal process.  Defendants' policies have prevented the volunteer attorneys from helping more detainees, and have prevented detainees (including Plaintiffs) from seeking their assistance before their cases are denied.

111.     For example, volunteer lawyers are denied the ability to speak to detainees if they do not have the detainees' names.  At the same time, volunteer attorneys have been reprimanded by ICE officers for attempting to write down the name and alien registration number ("A number") of detainees interested in seeking legal assistance.  For instance, ICE Officer Ralph Alcantar has refused the requests of volunteer attorneys to inform detainees that they were available to provide free legal assistance, and has refused to allow volunteer attorneys to write down names and A-numbers of detainees seeking help.  Officer Alcantar has indicated that the volunteer attorneys could not take down detainee information because solicitation by attorneys is not allowed.  He maintained this policy against "solicitation" even though it was explained to him that these volunteer attorneys would not be paid for their legal services.

112.     Similarly, ICE officers have prohibited volunteer attorneys from distributing a know-your-rights flyer containing information on how to contact the volunteer attorneys.  When attorneys attempted to distribute such a flyer in the "law library," ICE officers grabbed the forms from the detainees and told the attorneys that they were not to approach the detainees with legal information and that they could not pass out the flyers.

113.     ICE officers have also told detainees that they are not allowed to pass out such know-your-rights flyers.  When one attorney attempted to give a flyer to a detainee to share with

others, the detainee said she was "scared" to take a flyer and that she was not "allowed" to have a flyer.  The detainee reported that an ICE officer had screamed at another woman who had tried to pass the flyer out to other detainees.  Similarly, other detainees have reported that they were expressly told by ICE officers that such flyers were "prohibited."

114.     When a volunteer attorney contacted ICE management and a representative of ICE's Office of the Principal Legal Advisor at Artesia about the know-your-rights flyer, she was advised that the flyers would not be allowed and that passing them out was in violation of the facility's rules.

115.     ICE officers have further impeded detainees' ability to meet with volunteer attorneys by severely restricting detainees' access to the "law library," which is where volunteer attorneys consult with detainees.  Indeed, ICE officers have instructed detainees that they are only permitted to come to the "law library" if an attorney specifically asks for them, or if they have an appointment.  When one detainee who was not on the volunteer attorneys' client list attempted to approach an attorney, an ICE officer observed this and told her sternly that she was not "allowed" to speak to the attorney.  On numerous other occasions, mothers with children have requested to speak with a volunteer attorney at the "law library," only to be turned away by ICE officers.  Detainees have also reported that ICE officers have told them that there were no free lawyers and if they wanted a lawyer they had to pay for one themselves.

116.     Plaintiffs have experienced these restrictions directly.  For example, when Plaintiff M.R.R. asked a guard for permission to go to the "law library" to try to obtain a lawyer, the guard became visibly angry and refused to take her there.  Only after making repeated requests and submitting a written complaint was she allowed to go to the "library" to meet with a lawyer.  Similarly, Plaintiff G.L.V.A. was only able to obtain access to a volunteer attorney by

asking her roommate to deliver a message to the lawyers in the "law library" indicating that she was in need of representation.

117.     When Plaintiff M.S.P.C. attempted to find an attorney by asking an official at Artesia if she could get one, he told her that an attorney was not necessary.  Another detained mother was told by an ICE officer that an attorney would only facilitate her deportation.  Other women detained at Artesia are told they will be deported when they ask for information about attorneys.

118.     When Plaintiff R.E.C.G. finally managed to secure the assistance of a volunteer attorney, she encountered numerous barriers to her access to counsel.  On multiple occasions, her attorney added her to the list of detainees whose attorneys sought to meet with them, yet ICE failed to produce Ms. R.E.C.G. for those meetings.

119.     These restrictive policies have prevented many mothers from meeting with volunteer attorneys and, even worse, discouraged them from believing that an attorney would be able to help them.  Upon information and belief, many mothers and children at Artesia have been deported without ever seeing a volunteer attorney, even though having access to one may have made the potentially life-or-death difference between being deported and being granted asylum.

**Other Policies that Impede Effective Legal Representation**

120.     Even when families are fortunate enough to obtain counsel, the policies and procedures newly implemented at Artesia prevent and obstruct effective legal consultation and advocacy.  For example, under Defendants' policies and procedures, attorneys are unable to gain admission to the facility to meet with clients in a timely manner.  After arriving at the "law library," one attorney was forced to wait for two hours before the ICE officer staffing the

39

"library" called in her first clients.  As a result, attorneys have had to miss or be late to credible

fear interviews and immigration judge review hearings.

121.      In the "law library," space for attorneys to speak with clients is extremely limited

and not private.  ICE officers are routinely present in the attorney visitation area, precluding

confidential conversations between attorneys and clients.  One attorney recounted that all of the

people in the room, including the ICE officers, could overhear conversations between the women

and their attorneys.

122.      Mothers and children who become emotionally upset and begin weeping while

recounting their past suffering or fears of harm must do so while being observed by everyone in

the room, which exacerbates the trauma for themselves and others.  On one occasion, an ICE

officer in the law library chastised volunteer attorneys, telling them that the volunteers were

making the detainees upset and stirring up trouble.

123.      Another attorney had to bring a white noise machine in order to confer with a

lesbian client who feared anyone finding out about her sexual orientation.  The white noise

machines are of limited effectiveness in providing clients with confidentiality in the relatively

cramped space of the "law library," however, where separate attorney-client conferences must

occur within feet of each other.

124.      Because detainees brought to the "law library" are often not told beforehand that

they are going to meet with their attorneys, they frequently arrive without their legal documents.

125.      Because there is no childcare available during attorney-client meetings and ICE

officers require children to be within eyesight of their mothers, mothers do not have the option of

speaking with their attorneys without their children present.  The presence of children during

attorney meetings has inhibited attorney-client conversations or caused highly uncomfortable

situations, both because of the distraction caused by the children and because of the frequently sensitive nature of the asylum claims.

126.     One attorney has described her attempt to take a declaration from her client while the client's daughter sat in her lap.  The mother recounted the death threats she had received, and the numerous calls she had received from gang members describing what her daughter was wearing and threatening to shoot her daughter in the schoolyard.  While the mother cried and talked about her fear of returning to Honduras, her daughter stared at the floor.

127.      Attorneys' ability to communicate with colleagues and courts, to prepare and file documents, and to provide effective legal representation is curtailed because they are prohibited from bringing or using their cell phones inside the facility, have often lacked reliable access to basic office equipment, and are unable to file documents from within the facility.  Without the use of a cell phone, attorneys are prevented from contacting clients' relatives to confirm or request information that would support their clients' cases, and cannot contact their law offices to obtain file information, determine if documents have arrived, or coordinate for upcoming interviews or hearings.

**Other Policies Undermining the Credible Fear Process**

**Failure to Provide Sufficient Opportunity to Obtain Counsel**

128.     Because it is so difficult to obtain legal assistance, most of the mothers detained at Artesia must try to navigate the complex asylum process on their own—without legal training and without the ability to communicate in English.

129.     In many cases, women who indicate they would like to speak with an attorney are not advised that they can postpone their credible fear interviews in order to obtain a lawyer; instead they are asked, "Do you want to continue or not?"

130.     And if a detainee does express a desire to speak with an attorney before continuing with a credible fear interview or an immigration judge hearing, at best she is given only a brief time period in which to do so—a virtually impossible task given the small number of immigration attorneys servicing Artesia and Defendants' practices restricting telephone usage and attorney access.  Plaintiff M.S.P.C. was given three days to notify her attorney after her immigration judge review hearing was postponed, but because of restrictions on telephone use she was unable to notify her attorney in time, so her review hearing went forward without one.

131.     Without the assistance of an attorney, mothers have little or no understanding of the purpose of the credible fear interview, and have no way of knowing which facts are important to reveal or highlight.  For example, one mother failed her credible fear interview after she reportedly did not tell the asylum officer that she is a lesbian and had suffered persecution in her home country, because she was not aware that it could be relevant.

**Provision of Inadequate Time to Prepare for Credible Fear Interviews**

132.     While the statute contemplates that noncitizens in expedited removal may at times have to proceed without counsel (or other assistance), the new Artesia procedures have made it far more difficult to do so with any success.  Among other things, the amount of time being given to detainees to prepare their claims has been significantly shortened.

133.     Detainees are given virtually no advance notice of the date or time of their credible fear interviews before the asylum officer.  Often, detainees are awakened early in the morning, commonly at 5:00 a.m., to be brought to their interviews, and are not told where they are going.  As one attorney has explained, the detainees with whom she met did not receive advance notice of their credible fear interviews.  Rather, ICE officers would go to the dormitory

area, call a detainee name, and bring her to the law library without explaining to her where she was going, what papers were needed or with whom she would meet.

134.      For example, Plaintiffs M.R.R., B.C.M., and G.L.V.A. were given no advance notice of their credible fear interviews and had no time to prepare.  Similarly, because Plaintiff E.O.Z. learned of her scheduled credible fear interview on the same day it occurred, she had no real opportunity to prepare.  Consequently, these mothers had little time to gather evidence, obtain supporting documentation, obtain counsel, or consult with others.

**Requiring Attendance of Children During Credible Fear Interviews and IJ Reviews**

135.      The new policies at Artesia have required mothers to be with their children at all times, including during credible fear interviews.  As a result, they have been forced to present their claims to an asylum officer in front of their young children.  But those claims often involve sensitive details—the murder of a father, rape or sexual abuse, or threats on the children's lives. As a result, mothers will often shy away from providing the necessary details to substantiate their claims.  Or they will provide the details and thereby create even more trauma for the young children who have already been exposed to considerable trauma in leaving their homes.

136.      Plaintiff C.M.R., for example, was unable to explain all the reasons she was afraid to return to El Salvador with her seven-year-old son present.  While she stated generally that she had been abused by her son's father, she did not feel comfortable giving details of the abuse while he was present—abuse that included routine beatings for a period of two years (including while she was pregnant) that left her bruised and bloody, and threats to take her son away from her.

137.     Similarly, Plaintiff M.R.R., who was also interviewed with her two young children, did not feel comfortable talking about the murder of their father or the multiple threats on their lives while they were present.

138.     Plaintiff E.O.Z. also felt uncomfortable fully recounting the extent of the death threats she received in front of her daughter, out of concern that it would cause her further distress; indeed, some of the death threats were directed at her daughter specifically.  Likewise, Plaintiff G.L.V.A. did not feel comfortable explaining that her daughter's father had raped, beaten, and threatened her, with her daughter present at the interview.

139.     The presence of children during the credible fear interview is also distracting for both the mother and the asylum officer, with direct consequences for the mothers' claims for relief.  Mothers are required to respond to critical questions while at the same time entertaining and disciplining their young children, breastfeeding an infant, or dealing with a child who needs to use the bathroom in the middle of the interview.

140.     For example, Plaintiff C.M.R.'s seven-year-old son required her constant attention during the interview, making it difficult for her to concentrate.  No one offered her child care or told her that she could do her interview without her son present.

141.     Similarly, no one offered to watch Plaintiff M.S.P.C.'s ten-month-old baby during her interview.  As a result, she had to hold her baby throughout and could not concentrate. Likewise, Plaintiff M.R.R. had to bring her young children to her interviews, and watching them made it difficult for her to concentrate.

142.     Another detained mother was forced to proceed with her credible fear interview even though her sick baby was coughing and crying in distress.

143.     Mothers face these same obstacles during immigration judge review hearings, which are conducted by video teleconference with immigration judges based in Arlington, Virginia, and where they are again required to bring their children.  Mothers must struggle to pay attention to the immigration judge on the video screen while their children may be noisily marching back and forth around the hearing room.  Moreover, the immigration judges' images on the computer screens are extremely small, which makes for a stilted and exceptionally difficult circumstance for describing traumatic events underlying the mothers' fear of return.

144.     For example, one mother had to breastfeed her infant son while she was speaking to the immigration judge, who was a man, during her negative credible fear review hearing.  Meanwhile, her other son, who was four or five years old, was running around the "courtroom," pulling his mom's hair and then trying to sit on her lap.  At one point, after she had stopped breastfeeding the infant, the infant started to toddle around and banged his head on a metal desk.  While all of this was happening, the immigration judge continued to ask the mother questions about her asylum claims, which were serious and sensitive in nature.

145.     Similarly, Plaintiff M.S.P.C. had difficulty answering questions posed by the IJ, because she had to care for her ten-month-old baby while trying to concentrate on the hearing.  The presence of Plaintiff C.M.R.'s seven-year-old son at her immigration judge review hearing again prevented her from revealing any of the important information about the traumatic abuse she had suffered at the hands of her son's father.  The presence of her young children similarly prevented Plaintiff M.R.R. from giving her full story to the immigration judge.

146.     Not only were these women unable to fully explain their fears because of the presence and distraction of their children during their credible fear interviews, they were

ultimately unable to provide important details to the immigration judges who reviewed their negative credible fear determinations.

**Failure to Screen Children for Independent Asylum Claims**

147.     Defendants have also deviated from prior policy and the regulations by failing to ensure that mothers and children may each present their own independent asylum claims during the credible fear interview and immigration judge review proceeding.  Under established asylum law, a mother and child may have distinct reasons for obtaining asylum; the government must therefore ensure that both mothers and children understand their rights to ensure that a child's valid asylum claim is not being subsumed within the mother's claim.

148.     Sometimes an asylum officer will ask if the children want their claims to be separate from those of their mothers, but the officer does not explain what a separate claim would mean.  Detainees at Artesia, who fear being separated from their family members, are understandably reluctant to say they want to have their claims heard separately when the asylum officer has failed to explain what this means.

149.     In addition, children—even teenage children—are typically not questioned during the credible fear interview, even though they are often the targets of threatened or actual violence in their home countries and may have important information to help substantiate their credible fear claims.  For example, one attorney observed a credible fear interview during which the mother attempted to explain why she feared that a gang member would kidnap and rape her seventeen-year-old daughter.  The asylum officer seemed impatient and dismissive.  When the daughter asked to speak and started to explain why she was afraid, the officer interrupted her and told her that he did not need to hear her story.

150.     Plaintiffs P.J.C.V. and P.O. each potentially have separate bases for asylum from their mothers, but neither has been provided a separate credible fear evaluation.  During her mother's interview, fifteen-year-old Plaintiff P.J.C.V. was asked one question: whether she was afraid to return.  She said yes, because of gangs, but the asylum officer followed-up only cursorily.  Thus, she had no opportunity to recount the traumatic sexual abuse to which gang members had subjected her.  She was also afraid and ashamed to discuss this abuse in front of her mother.  Likewise, although eleven-year-old Plaintiff P.O. has an independent asylum claim based on threats to her own life, she has never been asked about her own fears or scheduled for a separate credible fear interview.

**Policies Undermining Effective Representation by Counsel During Credible Fear Interviews and IJ Review Hearings**

151.     Defendants' policies also set up countless hurdles even when families manage to find counsel to assist them.  Under the new policies and procedures, Defendants do not provide adequate notice to retained counsel regarding the credible fear interview or any immigration judge review of a negative credible fear determination.  ICE officers at Artesia have even instructed volunteer attorneys that, due to privacy concerns, attorneys are not allowed access to the Immigration Court's docket to find out when clients have hearing dates.

152.     Retained counsel waiting on-site or via telephone to attend credible fear interviews or immigration judge review hearings have been precluded from doing so, even when such counsel have made a formal appearance by filing the required representation forms (a G-28 or E-28).  In some instances, scheduled proceedings have been rescheduled without providing any notice to the attorney of record, causing the attorney to miss the proceeding.  For example, an attorney retained by Ms. M.S.P.C.'s family only learned of her immigration judge review hearing the day before it was scheduled.  When the attorney called the Artesia Facility at 8:10

47

a.m. (nearly three hours before the scheduled hearing time), the attorney was informed that the

hearing was already underway.  Although the immigration judge was notified that her attorney

was on the line and ready to represent her, the immigration judge refused to permit the attorney

to be patched into the hearing.

153.     Similarly, Plaintiff C.M.R. was only given notice of her credible fear interview on

the morning of the very day it was conducted.  Thus, although she had managed to obtain an

attorney, he was not available when the asylum officer attempted to reach him, and the interview

went forward without her attorney's participation.

154.     Another attorney who had driven four hours to Artesia to attend a client's

immigration judge review hearing was precluded from attending the hearing because the EOIR

1-800 hotline provided the hearing time in the wrong time zone.  Further, even though she

requested to meet with her client two hours prior to the actual scheduled time of the hearing, ICE

officers made her wait for one hour before bringing her client to see her.  By that time, her

client's hearing had already taken place, having been held earlier than the actual scheduled time.

155.     Indeed, even when they are present, attorneys are routinely prevented from

effectively participating in credible fear interviews and immigration judge reviews of negative

credible fear determinations.

156.     For example, attorneys are sometimes prevented even from speaking during the

credible fear interview before the asylum officer.  One attorney has described being prohibited

from asking any questions during a credible fear interview to help clarify issues.  Instead, at the

end of the interview, the asylum officer permitted the attorney to suggest questions, but then the

officer decided whether or not to pose the questions to the attorney's client.

157.     Likewise, attorneys are not permitted to speak during the immigration judge reviews, even though the referral notice provided by the asylum officers specifically states that the individual has a right to be represented by an attorney in the hearing, and even though applicable regulations provide that "[t]he Immigration Judge may receive into evidence any oral or written statement which is material and relevant to any issue in the review."  8 C.F.R. § 1003.42(c).

158.     Although an attorney for Plaintiff E.O.Z. had prepared a direct examination for her review hearing, the immigration judge said that there was "no role for an attorney" during the hearing.  This judge then went on to ask Ms. E.O.Z. whether she belonged to a particular social group—a complicated legal concept that, without context or explanation, only an attorney would be capable of understanding and properly answering.

159.     In another case, an immigration judge explained—off the record—his policy that attorneys are not allowed to speak during credible fear review hearings.  Only after repeated requests by the attorney did the judge agree to state on the record that he would not let the attorney speak during the hearing.  When the attorney attempted to object—on the record—to her limited role, the judge proceeded to berate the attorney and threatened to expel her from the courtroom if she said "one more word."

160.     On another occasion, a volunteer attorney attempting to assist a client in a review hearing was informed by Judge Robert Owens that "The respondent is not represented in these proceedings."  He continued, "There is no opportunity to question the respondent.  There is no opportunity to introduce evidence or exhibits.  You cannot make an opening or a closing.  Even appearance of counsel is at the discretion of the court, and I may or may not allow counsel to be present."

161.     Similarly, Judge Roxanne Hladylowycz informed a volunteer attorney attempting to represent a client that there was "no role" for attorneys at review proceedings and repeatedly prevented from speaking.  After refusing to allow the attorney to raise two procedural issues before the review began, Judge Hladylowycz demanded that the attorney be removed, and then abruptly terminated the hearing without explanation and walked out.

162.     Another attorney attempting to attend an immigration judge review hearing on behalf of a client was escorted out of the hearing room after the judge stated that there was no role for an attorney in the hearing.

163.      Attorneys simply attempting to observe immigration judge reviews for Artesia detainees in Arlington, Virginia, where the immigration judges are based and participate in hearings by videoconference, have been prevented from entering the hearing room.  Judge Roxanne Hladylowycz informed a volunteer attorney that those proceedings were now closed. She stated that someone had brought the issue of public access to Artesia review hearings to the attention of EOIR Headquarters and that the EOIR Public Affairs Office had issued instructions to close all Artesia hearings.

164.     For those mothers and children who are found to have a credible fear of persecution and are therefore referred for full removal proceedings before an immigration judge pursuant to INA § 240, Defendants' policy of detention and accelerated processing continues to undermine their rights.  In a stark departure from its prior policy favoring release of individuals who passed the credible fear screening and met certain other criteria, ICE initially adopted a "no bond" policy for families at Artesia who established credible fear, a policy that appears to be specific to this group of families that recently arrived from Central America.

165.     Defendants' new policies and procedures at Artesia, separately and in combination, makes it more difficult for the families detained there to establish a credible fear and avoid expedited removal.  These new procedures are a deliberate attempt to achieve this result.  The new system at Artesia reflects and implements Defendants' overarching policies of prejudgment of potential asylum claims and prioritization of accelerated removal above all other goals.

**The New Expedited Removal Procedures First Implemented at Artesia Differ Markedly From Previous Expedited Removal Procedures for Families and Adults**

166.     At the time that the Artesia facility began detaining families, the only preexisting detention facility housing families with children processed under expedited removal was the Berks Family Residential Center ("Berks") located in Leesport, Pennsylvania (Berks County).  While expedited removal inherently suffers from procedural limitations, the policies and procedures that have governed the treatment of families seeking asylum at Berks nonetheless stand in stark contrast to those first implemented at Artesia.

167.     At Berks, attorneys have not faced systematic obstacles to visiting with or representing detainees.  Berks has two attorney visitation rooms (for its maximum 85 detainees), both of which are fully enclosed to ensure confidentiality.  Childcare has also been provided at Berks to permit the detainees to meet in private with their attorneys without children present.  To schedule an appointment, attorneys need only notify the case worker of the date and time, and almost no advance notice is needed.  Attorney-client meetings at Berks have lasted as long as eight hours.

168.     Berks detainees may fax, mail, or call any attorney of their choosing.  The attorney need not have filed a Form G-28 or Form E-28 in order to receive these communications from residents.  All Berks detainees have counselors who facilitate such communications.

Detainees may fax lengthy, confidential documents, such as the asylum officer's credible or reasonable fear determination and record of the detainee's sworn statement (*i.e.*, the summary of the interview in question-and-answer format).  Counselors also accept and promptly deliver phone messages for attorneys calling detainees.  Detainees can then call their attorneys back and talk as long as needed.  Attorney phone consultations with detainees sometimes last up to an hour.

169.     In the area surrounding Berks, there are a sufficient number of immigration attorneys available to provide representation, including attorneys in Berks County, Dauphin and York Counties (located approximately one hour from Berks), and Philadelphia (approximately one-and-a-half hours away) who have provided legal representation to Berks detainees.

170.     It has been standard practice for an asylum officer to first ask a Berks detainee if she has an attorney prior to commencing a credible fear interview.  If the detainee does have an attorney, an effort is made to include the attorney in the interview, even if the attorney's participation can only be accomplished by phone.

171.     The asylum officers who interview Berks detainees have not required them to answer questions calling for a legal conclusion, such as whether the detainee is a member of a social group—rather, the asylum officers have taken it upon themselves to identify social groups.

172.     At Berks, parents are able to attend the credible fear interview without their children present.  Children are not brought into the interview room unless the parent opts to have them there.  Young children are generally either cared for by staff members or another detainee.  There is also a playroom located next to the interview room.  Older children may also be interviewed by the asylum officers, particularly when they may have independent experiences that form the basis for a potential asylum claim.

173.     In contrast to the low passage rate for credible fear interviews conducted at Artesia, few families detained at Berks fail their credible fear interviews.  Upon information and belief, in 2013, out of over 500 families only two or three families received negative determinations from an asylum officer.

174.     Furthermore, most families at Berks have been granted parole and released from detention following a positive credible fear determination, usually within days of filing or lodging their asylum application.  They are usually paroled on a humanitarian basis, and requiring a detainee to post bond in order to be released is unheard of.

175.     Past practices at other detention facilities that house adults in the expedited removal system reinforce that the policies and procedures first implemented at Artesia are new. These facilities include, among others, the T. Don Hutto Detention Center in Taylor, Texas; the West County Detention Facility in Richmond, California; the Otay Detention Facility in San Diego, California; the Delaney Hall Detention Facility in Newark, New Jersey; the Elizabeth Detention Facility in Elizabeth, New Jersey; the West Texas Detention Facility in El Paso, Texas; and the Denver Contract Detention Facility in Denver, Colorado.

176.     Attorneys with clients at these other facilities—where many Central American migrants have been detained—have not faced systematic barriers to their ability to meet with and assist detainees during the expedited removal process.  Attorneys generally receive notice of credible fear proceedings, are able to communicate with detainees, are provided a confidential meeting space, and participate meaningfully during the credible fear interview and immigration judge review hearings, including by making statements summarizing a client's asylum claim. For example, at the West County Detention Facility, attorneys have unrestricted access to clients at the facility, and asylum officers have provided notice to attorneys of upcoming credible fear

interviews and have had a practice of scheduling those interviews to ensure the presence of attorneys.

177.     Historically, as with the families detained at Berks, the vast majority of noncitizens processed for expedited removal at these adult facilities and referred for a credible fear interview are found to have a credible fear.  For example, at the Delaney Hall Detention Facility and the Elizabeth Detention Center, 95 percent of individuals have received positive credible fear determinations, including migrants from Central America who are transferred to the facilities from the border region.

178.     In sum, the policies and procedures governing credible fear interviews and attorney consultation that have been newly implemented in Artesia differ significantly from preexisting policies and procedures elsewhere in the country.

## CAUSES OF ACTION

### First Claim

### (Violation of the Immigration and Nationality Act, the Convention Against Torture, the Foreign Affairs Reform and Restructuring Act of 1998, Implementing Regulations, and the Administrative Procedure Act)

179.      All of the foregoing allegations are repeated and realleged as though fully set forth herein.

180.     The Immigration and Nationality Act and implementing regulations, including 8 U.S.C. § 1225(b)(1) (expedited removal),  8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42; 8 U.S.C. § 1158 (asylum), and 8 U.S.C. § 1231(b)(3) (withholding of removal), and the United Nations Convention Against Torture ("CAT"), implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at  8 U.S.C. § 1231 note), entitle Plaintiffs to a meaningful

opportunity to apply for asylum, withholding of removal, and CAT relief, as well as numerous procedural safeguards in connection with those applications.  These provisions also entitle Plaintiffs to a grant of withholding of removal and CAT relief upon a showing that they meet the applicable legal standards.  Defendants, through their directives, have violated these statutory and regulatory rights in numerous respects, including by, both singularly and collectively:

a.   prejudging Plaintiffs' claims, regardless of their individual merits;

b.   applying an unlawful, more burdensome standard to Plaintiffs' claims;

c.   employing intimidation and coercion to dissuade Plaintiffs from exercising their rights;

d.   imposing numerous restrictive and/or inadequate policies regarding telephone access, attorney visitation and access, notice of credible fear interviews and review hearings, childcare, and other matters that preclude a meaningful ability to consult with and be assisted by attorneys or others prior to and during the credible fear process and the immigration judge review process;

e.   implementing policies concerning the credible fear interview process that provide inadequate notice and an insufficient amount of time to prepare for credible fear interviews and immigration judge review hearings, fail to ensure that Plaintiffs are able to knowingly decide whether to proceed in their credible fear determinations together or separately with other family members, fail to ensure that all relevant information is elicited from family members, fail to ensure privacy during the credible fear interview, fail to provide adequate information about the credible fear process, and prejudice individual applicants for failing to correctly answer questions calling for legal conclusions during the interview or review hearing.

**Second Claim**

**(Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)**

181.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

182.     The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."

183.     Plaintiffs have protected interests in applying for asylum, withholding of removal, and CAT relief, in obtaining withholding of removal and CAT relief upon a showing that meets the applicable standards, and in not being removed to a country where they face serious danger and potential loss of life.

184.     Plaintiffs, having effected entry into the United States, are entitled under the Due Process Clause to a fair hearing of their claims, including at a minimum a procedure that is in compliance with applicable statutory and regulatory standards.

185.     Defendants, through their directives, have violated Plaintiffs' right to due process in numerous respects, including by, both singularly and collectively:

a.   prejudging Plaintiffs' claims, regardless of their individual merits;

b.   applying an unlawful, more burdensome legal standard to Plaintiffs' claims;

c.   employing intimidation and coercion to dissuade Plaintiffs from exercising their rights;

d.   imposing numerous restrictive and/or inadequate policies regarding telephone access, attorney visitation and access, notice of credible fear interviews and review hearings, childcare, and other matters that preclude a meaningful ability to consult with and be

56

assisted by attorneys or others prior to and during the credible fear process and the immigration judge review process;

e.  implementing policies concerning the credible fear interview process that provide inadequate notice and an insufficient amount of time to prepare for credible fear interviews and immigration judge review hearings, fail to ensure that Plaintiffs are able to knowingly decide whether to proceed in their credible fear determinations together or separately with other family members, fail to ensure that all relevant information is elicited from family members, fail to ensure privacy during the credible fear interview, fail to provide adequate information about the credible fear process, and prejudice individual applicants who fail to correctly answer questions calling for legal conclusions during the interview or review hearing.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully prays this Court to:

a.  Declare contrary to law the system of expedited removal Defendants are applying to noncitizens detained at the Artesia detention facility;

b.  Enter an order enjoining and staying Defendants from continuing to implement their unlawful system of expedited removal at the Artesia detention facility;

c.  Enter an order directing Defendants to submit a plan for corrective action for approval by the Court;

d.  Issue an order directing Defendants to provide each of the Plaintiffs a meaningful opportunity to apply for asylum, withholding of removal, and CAT relief before any removal order is executed, including a new credible fear interview and, if relevant, a new immigration judge credible fear review hearing, with a reasonable amount of advance time to obtain and meet

with counsel and prepare for each, as well as notice to Plaintiffs and their retained counsel as to the time of each such interview and/or hearing;

    e.   Require that Defendants return any deported Plaintiff to the United States for new proceedings that comply with the law;

    f.   Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

    g.   Grant such further relief as the Court deems just, equitable, and appropriate.


Dated: August 22, 2014                    Respectfully submitted,

                                    /s/  Matthew E. Price
                                    Matthew E. Price, D.C. Bar. #996158
                                    Jenner & Block LLP
                                    1099 New York Avenue, NW
                                    Suite 900
                                    Washington, DC 20001
                                    (202) 639-6873

                                    Jennifer Chang Newell
                                    Cecilia D. Wang
                                    Kate Desormeau
                                    Stephen B. Kang
                                    American Civil Liberties Union
                                    Foundation, Immigrants' Rights Project
                                    39 Drumm Street
                                    San Francisco, CA 94111
                                    (415) 343-0774

                                    Lee Gelernt
                                    Judy Rabinovitz
                                    Andre Segura
                                    American Civil Liberties Union
                                    Foundation, Immigrants' Rights Project
                                    125 Broad Street, 18th Floor
                                    New York, NY 10004
                                    (212) 549-2600

                                    Trina Realmuto

National Immigration Project of the
National Lawyers Guild
14 Beacon Street, Suite 602
Boston, MA 02108
(617) 227-9727

Linton Joaquin
Karen C. Tumlin
Melissa Keaney
Alvaro Huerta
National Immigration Law Center
3435 Wilshire Boulevard, Suite 2850
Los Angeles, CA 90010
(213) 639-3900

Melissa Crow, DC Bar #453487
Beth Werlin, DC Bar #1006954
Emily Creighton, DC Bar #1009922
American Immigration Council
1331 G Street, NW, Suite 200
Washington, D.C. 20005
(202) 507-7523

Zachary Nightingale
Lisa Knox
Van Der Hout, Brigagliano & Nightingale,
LLP
180 Sutter Street, 5th Floor
San Francisco, CA 94104
(415) 981-3000

Gabriel A. Fuentes
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2808

Alexandra Smith
American Civil Liberties Union
of New Mexico
1410 Coal Avenue, SW
Albuquerque, NM 87104
(505) 266-5915

Mitra Ebadolahi
Gabriela Rivera
American Civil Liberties Union of San
Diego & Imperial Counties
PO Box 92138-7131
San Diego, CA 92138-7131
(619) 232-2121

Arthur B. Spitzer, D.C. Bar. #235960
American Civil Liberties Union
of the Nation's Capital
4301 Connecticut Avenue, NW, Suite 434
Washington, D.C. 20008
(202) 457-0800